**COOPER FOUNDATION**
v.
**O'MALLEY.**
Civ. 49–50.

United States District Court
D. Nebraska, Omaha Division.
May 26, 1954.

Beghtol, Mason & Anderson, John C. Mason and Richard A. Knudsen, all of Lincoln, Neb., for plaintiff.

Donald R. Ross, U. S. Atty., Omaha, Neb., and Ethan B. Stroud, Tax Division, Department of Justice, Washington, D. C., for defendant.

DONOHOE, Chief Judge.

This is a suit for refund of federal income taxes which plaintiff alleges were illegally and wrongfully assessed and collected. This court has jurisdiction by virtue of Section 1340, Title 28, U.S.C.A.

In its income tax return for 1943, Interstate Theatres, Inc., deducted as an ordinary and necessary business expense a lease premium of $117,458.35 as a deduction from gross income. At the end of 1943, the assets of Interstate Theatres were distributed in liquidation to the sole stockholder, Cooper Foundation. A notice of deficiency was sent to the transferee taxpayer, Cooper Foundation, on or about January 3, 1945, in the

amount of $76,926.25 by the Internal Revenue Service of the United States Treasury Department. One of the grounds for the deficiency was the disallowance of the deduction for $117,458.35. On January 24, 1947, taxpayer executed Form 870, Waiver of Restrictions on Assessments and Collections of Deficiency on Tax as determined by the Treasury Department, and the following payments were made by the plaintiff on the dates stated:

| | |
|---|---|
| May 1, 1946 | $32,362.62 |
| September 16, 1946 | 11,576.49 |
| September 15, 1947 | 41,041.25 |

On March 14, 1947, the assessment of the deficiency was made and certified against the transferee of the assets of Interstate Theatres, Inc., Cooper Foundation. The first two payments were placed in a suspense account. On April 11, 1947, part of the first payment was credited to the assessment of March 14, 1947, and on April 15, 1947, the second payment was credited. $7,642.98 of the first payment was credited to the assessment on September 3, 1947. The last payment was so credited when received. On November 18, 1948, Cooper Foundation, the transferee, filed its claim for refund of $84,980.36 for income taxes paid for Interstate Theatres, Inc., for the year 1943. On March 15, 1950, notice of disallowance in full of the transferee's claim was given by the Commissioner of Internal Revenue. All conditions precedent to the institution of this action have been fulfilled. 26 U.S.C.A. § 3772.

■ Since neither party claimed a jury, trial was had to the court,[1] and after careful consideration of the properly admissible evidence adduced at the trial, the court makes the following special

### Findings of Fact [2]

Interstate Theatres, Inc., was incorporated in Colorado in the year 1933, and engaged in the business of operating three motion pictures theatres, the Ute, Trail and Tompkins, in Colorado Springs, Colorado. From 1933 until December 27, 1943, Mr. J. H. Cooper and Mr. John E. Tompkins each owned one-half of the outstanding stock of Interstate. It appears that from July 7, 1943, until the date of its dissolution, December 29, 1943, Mr. Cooper was president and Mr. Tompkins vice president of Interstate. The Cooper Foundation is a tax exempt charitable organization organized by Mr. J. H. Cooper in 1934. Mr. Cooper was at all times material to this action, president of the Cooper Foundation.

In July of 1943, Interstate Theatres, Inc., was operating the Ute Theatre under a lease from the Rialto Corporation.[3] The leasehold term was twelve years commencing sometime in 1935, and ending sometime in 1947.[4] By the terms of the lease the lessee agreed to pay $17,000 annually in equal monthly installments plus fifty per cent of the net profits [5] from the operation of all of the lessee's theatres in Colorado Springs.

The net income of Interstate Theatres, Inc., in the 1930's was not particularly high. For example, in 1934 it was $1,118.22; in 1935, $4,119.14; in 1936, $15,218.34; in 1937, $6,735.55; and in 1938, $5,310.02. However, in the early 1940's

1. Rules 38 and 39, Fed.Rules Civ.Proc., 28 U.S.C.A.

2. As required by Rule 52, Fed.Rules Civ. Proc., 28 U.S.C.A.

3. The original lessor of the Ute Theatre was the Regal Theatres Corporation, the owner of the theatre prior to the Rialto Corporation. It seems that Mr. Cooper was also president of both the Regal and Rialto Corporations.

4. The lease is dated the 30th day of March, 1935. However it was not to commence until the lessor had completed certain alterations. These alterations must have been completed in 1935 because all of the testimony on the point indicates that in 1943 the lease had four more years to run.

5. The lease uses the term "gross revenue" minus "operating expenses" and the latter are defined. Reading these terms together indicates that the parties had "net profit" in mind.

business began to improve. The garrison economy necessitated by World War II was a boon to national business. The trend was upward. With particular reference to the theatre business in Colorado Springs, it appears that Peterson Field, and certain other military installations, were initiated or reactivated, bringing substantial numbers of military personnel as potential theatre patrons within reach of the three Interstate theatres. It was only natural that the income of Interstate went up phenomenally in 1942 to $42,766.

On July 6, 1943, the Rialto Corporation sold to the Cooper Foundation, the Ute Theatre for the sum of $51,026.37.[6] The deed of conveyance is subscribed and acknowledged on behalf of Rialto by J. H. Cooper, president, and Pat McGee, secretary.

In the very early days of July the sole stockholders of Interstate, Mr. Cooper and Mr. Tompkins, held a conference at the Broadmoor Hotel in Colorado Springs, Colorado. An attorney, Mr. Rankin, and an accountant, Mr. Roberts, were present for at least some portions of the conference. The parties discussed the execution of a new lease for the Ute Theatre. It seems that Mr. Tompkins wanted a long-term lease and that Mr. Cooper was willing on behalf of Cooper Foundation to give a long-term lease but he wanted a very large premium payment. In addition to the matter of the leasehold, it seems there was some discussion between Mr. Rankin, Mr. Roberts and Mr. Tompkins relating to the sale of Mr. Tompkins' stock in Interstate to the Cooper Foundation.

The minutes of the meeting of the Stockholders of Interstate Theatres, Inc., held on July 7, 1943, at the Broadmoor Hotel in Colorado Springs, Colorado, are in part as follows:

"Mr. Cooper informed the directors that the Cooper Foundation is a charitable corporation of Lincoln, Nebraska, and has acquired the fee title to the Ute Theatre property in Colorado Springs, Colorado, and in view of the fact that the outstanding lease of the Corporation on said property will expire in approximately four (4) years from this date that it is of the utmost importance to the Corporation that a new lease be negotiated as soon as possible on satisfactory terms. He then suggested to the Directors that he believed it would be possible to negotiate a new lease with said Cooper Foundation on the same terms and conditions as the present lease, except that the compensation, in addition to the fixed rental of one-half (½) of the net proceeds of the Corporation from those operations in Colorado Springs, Colorado, be clearly specified in the lease to be out of gross income and before tax, and that such new lease would run for a period of twenty-five (25) years from July 15, 1943, with the outstanding lease cancelled upon the execution thereof. That it would be necessary in order to obtain such lease to pay to the Cooper Foundation a substantial premium, and that he believed, upon payment of the sum of $40,000.00 in cash and the assignment and transfer to the Cooper Foundation of all of the first and second mortgage bond and the Deeds of Trust securing same on the Trail Theater property of Colorado Springs, Colorado, such lease could be obtained. Mr. Cooper recommended that the Directors authorize the execution of such lease on such terms if it could be obtained."

The minutes disclose that Mr. Cooper's recommendation was put in the form of a resolution and adopted unanimously.

---

6. The Court considers this sale price the most convincing evidence of the fair market value of the Ute Theatre on or near August 13, 1943. The testimony of Mr. Roberts on this point is rejected because Mr. Roberts is an employe of Mr. Cooper, and Mr. Robert's qualifications as an expert on theatre valuation are something less than impressive.

On July 9, 1943, the Board of Trustees of Cooper Foundation met in Lincoln, Nebraska, and resolved to enter into a lease with Interstate Theatres, Inc., for the Ute Theatre for a period of twenty-five years with fixed rental at $17,000 per year, in addition, one-half the net proceeds of Interstate Theatres, Inc., from its operation of theatres in Colorado Springs, on consideration of the payment of a premium of $40,000 in cash, and the assignment and transfer to the Foundation of the first and second mortgage bonds and deeds of trust on the Trail Theatre upon execution of the lease.

The management agreement between Mr. Cooper and the Cooper Foundation, as reflected in the minutes of the Cooper Foundation for July 9, 1943, states in substance that in any case where the assets of the Foundation, or any reinvestment, management or control thereof is connected with a matter in which Mr. Cooper has any personal interest or any corporation in which he has an investment or other interest, or in which any of his blood relations are connected, such transaction must be approved by a majority of the trustees of the Foundation at a meeting of the trustees. The proposed new lease of the Ute Theatre to Interstate was apparently approved in the appropriate manner because on August 13, 1943, the Cooper Foundation executed and acknowledged a lease for the Ute Theatre in favor of Interstate.

The new lease was for a term of twenty-five years commencing on July 13, 1943. At the time the new lease was executed the old lease held by Interstate had four years to run. The provisions in the new lease, including the rental provisions, were substantially the same as the provisions in the old. The new lease was executed on behalf of the Cooper Foundation by J. H. Cooper, president, and S. C. Waugh, secretary; and on be-half of Interstate Theatres, Inc., by J. E. Tompkins, vice president and J. Alfred Ritter, secretary.

The lease does not mention any premium payment. The extrinsic evidence relating to it is this: The general ledger contains two credit[7] entries totalling $117,458.35. The first entry, dated July 24, 1943, in the sum of $77,458.35 is designated "Partial payment lease premium"; and the second entry, dated August 7, 1943, is designated "Cooper Foundation". The accrual ledger shows an offsetting entry indicating that second mortgage notes on the Trail Theatre in the then due sum of $37,458.35[8] and first mortgage notes on the Ute Theatre in the then due sum of $40,000 were assigned in partial payment of the premium for the new Ute Theatre lease. Mr. E. Frank Roberts, the accountant who made the entries, testified that he recalled that Interstate owned such notes before the entry was made and that they were, on the date indicated, transferred to the Cooper Foundation. He also testified that a check in the sum of $40,000, numbered 375, was issued to the Cooper Foundation for the purpose of paying the balance of the lease premium.

On December 27, 1943, Mr. J. E. Tompkins and his attorney, Mr. David Stickler, came to Lincoln, Nebraska, for the purpose of negotiating a sale of Mr. Tompkins' fifty per cent stock interest in Interstate Theatres, Inc., to Cooper Foundation. At this meeting two contracts were entered into between Mr. J. E. Tompkins and the Cooper Foundation.

The first was a sales contract whereby Tompkins agreed to sell all of his fifty per cent stock interest in the Interstate Theatres, Inc., to the Cooper Foundation for the consideration of $10,000 cash, plus one-fourth the, net operating income from the three theatres in Colorado Springs then being operated by Inter-

---

7. The first entry appears in a debit column but is entered in red ink to indicate a credit item; the second entry is in a credit column.

8. The Cooper Foundation foreclosed this mortgage and bid the property in at pub-lic sale on December 4, 1943. After the period of redemption had run the sheriff executed a deed conveying the Trail Theatre to the Cooper Foundation on January 5, 1945.

state Theatres, Inc. This sum was to be paid in quarterly installments for a period of fifteen years. It is interesting to note that as a stockholder Mr. Tompkins was entitled to somewhat the same annual benefits. The outstanding lease on the Ute Theatre provided that fifty per cent of the operating profits of Interstate Theatres were to be paid to the lessor, Cooper Foundation, and the remaining fifty per cent was available to be distributed to the two equal stockholders of Interstate. Thus Cooper and Tompkins, prior to the time Tompkins sold his stock, each received one-fourth of the net profits.[9] The sales contract provided that (1) the practices of the past seven years in computing expenses would be followed; (2) the purchaser (Cooper Foundation) would furnish to the seller (Tompkins) a statement of the daily receipts of the properties and business owned by Interstate, a copy of weekly reports made by the managers of the property and business of Interstate, a copy of the usual and customary operating reports, a copy of the usual and customary weekly reports of transactions, and a copy of the usual and customary quarterly auditing statements; (3) that all checks in payment of any monies of any kind whatsoever issued would not be delivered to the respective payees unless the same be countersigned by Tompkins, and that in the event Tompkins should fail to countersign any checks, then the question shall be determined by arbitration in the manner set out in another part of the contract; (4) that Tompkins would be furnished office accommodations in the property of Interstate Theatres, Inc., substantially the same as he now enjoys; and (5) that the Cooper Foundation would make weekly advancements to Tompkins in the amount of $235 against the quarterly installments of the purchase price due to Tompkins. In this sale contract the

Cooper Foundation and Tompkins further agreed that the five-month old, twenty-five year lease on the Ute Theatre would be cancelled and Interstate Theatres would be dissolved.

The second contract entered into by Tompkins and Cooper Foundation provided that Tompkins and his heirs would not compete in the Theatre Business for a period of ninety-nine years. Under this contract Tompkins was to be paid an amount equal to one-fourth of all the net rentals from the Trail Theatre for ninety-nine years. However, the agreement could be extinguished in twenty-five years by Cooper Foundation paying Tompkins or his estate $4,000 each year, or a total of $100,000. Why the income from the Trail Theatre was used as a measuring stick is not quite clear. But these facts seem pertinent. Tompkins purchased the Trail Theatre in 1921, and had contributed it to Interstate in exchange for stock in 1933; and he testified that he was to get $100,000 for staying out of business "and for the interest (he) had in the Trail Theatre." At the time the ninety-nine year agreement not to compute was executed Tompkins was 69 years old.

Pursuant to the two contracts mentioned, on December 28, 1943, Tompkins transferred his stock to the Cooper Foundation; and on the same date Mr. J. H. Cooper sold his fifty per cent interest in the Interstate Theatres, Inc., to the Cooper Foundation for an undisclosed consideration. Thus Cooper Foundation became the sole stockholder of Interstate.

The lease premium of $117,458.35 had been set up as a capital asset on the books of Interstate Theatres, Inc. On December 29, 1943, this lease asset was written off the Interstate books as a loss of $117,458.35 by the accountant Mr. E. F. Roberts. On this same day, December 29, 1943, Interstate Theatres, Inc. was

---

9. This Court recognizes that the method of computing the amount to be distributed to Tompkins as a stockholder, and Tompkins as payee under the contract, was not precisely the same. But, with the exception of increased advantages resulting from elimination of certain corporation taxes, the annual economic benefits to which Tompkins was entitled as payee under the contract certainly approximates the annual economic benefits to which he was previously entitled as a stockholder.

dissolved and all of its assets were distributed to its sole stockholder, Cooper Foundation.

On Interstate's federal income tax return for 1943, the lease premium of $117,458.35 was deducted as an ordinary and necessary business expense. The Commissioner of Internal Revenue disallowed this deduction to Interstate by levying a deficiency assessment and the Cooper Foundation as transferee of Interstate paid the tax and instituted this action for refund.

### Discussion

The sole question is whether Interstate Theatres, Inc., is entitled to a deduction of $117,458.35 in determining its taxable net income for the year 1943.

### a) Parol Evidence Rule

 The Government objected to the introduction of extrinsic evidence for the purpose of proving that Interstate agreed to pay Cooper Foundation a premium of $117,458.35 for the lease. The lease does not expressly refer to the premium and the Government takes the position that reception and consideration of this extrinsic evidence violates the parol evidence rule. However, the court has received and considered this evidence because the Government is in no position to assert the rule.

"The parol evidence rule does not apply, and may not properly be invoked by either party to the litigation against the other, where at least one of the parties to the suit is not a party or a privy of a party to the written instrument in question and does not base a claim on the instrument or assert a right originating in the instrument or the relation established thereby." 32 C.J.S., Evidence, § 861, p. 791.

In Scofield v. Greer, 5 Cir., 1950, 185 F. 2d 551, 552, the taxpayer, in a suit to recover federal income taxes, introduced extrinsic evidence which seemed to contradict the terms of a written property settlement executed by the taxpayer and his wife incident to a divorce. In com-

menting on the application of the parol evidence rule the court said:

"The appellant contends that the court below violated the parol evidence rule by admitting testimony which contradicted the terms of the written agreement executed by Dr. Greer and Mrs. Ruth Phillips Greer; but this position is deemed by us not to be well taken, because appellant was not a party or privy of a party to such written agreement, and the parol evidence rule is not applicable. Moreover, the litigation concerns federal taxes, and the government was not a party to the written instrument involved."

The same principle is announced in United States v. Patterson, 1953, 92 U.S. App.D.C. 222, 206 F.2d 433; Stern v. Commissioner of Internal Revenue, 2 Cir., 1943, 137 F.2d 43. From these cases it seems clear that counsel for the government may not assert the parol evidence rule for the purpose of barring evidence relating to the premium payment for the lease.

### b) Evidence of Payment

 The Commissioner's assessment has the support of a presumption of correctness and the petitioner has the burden of proving it to be wrong. Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212. This means that the taxpayer has in this case the burden of proving by a preponderance of the evidence first, that the payment of $117,458.35 for the lease was actually made by Interstate Theatres, Inc., in 1943; and second, that it was properly deductible under the provisions of the Internal Revenue Code by Interstate for the year 1943.

 The books of the taxpayer's corporate predecessor and the testimony of Mr. Roberts establish that Interstate paid $40,000 by check and assigned certain mortgage notes to the Cooper Foundation for the lease. Although counsel for the Government stresses the fact that neither the cancelled check nor the mortgage assignments were introduced in evidence, the court would be reluctant to

consider petitioner's failure to pyramid evidence to the peak as a basis for rejecting that at the base. Interstate's books were properly admitted as records made in the regular course of business (See 28 U.S.C.A. § 1732) and Mr. Robert's testimony on the point, though that of an interested witness, stands uncontradicted. Consequently this evidence is accepted as true. See A. & A. Tool & Supply Co. v. Commissioner, 10 Cir., 1950, 182 F.2d 300. Although the taxpayer proved only the face value of the notes, for the purpose of discussion the court will assume that fair market value [10] has been proven and that Interstate actually paid $117,458.35 to Cooper Foundation.

### c) Interstate Sustained No Loss

If a leasehold is acquired for business purposes for a specified sum, the lessee may take as a deduction in his return only an aliquot part of such sum each year based on the number of years the lease has to run. Reg. 118, Sec. 39.23(a)(10). The reason for this rule is that such advance payments have the character of capital investments whose benefits are spread throughout the life of the lease for which only aliquot deductions commensurate with the ratio of the exhaustion of the lease may be taken. Southwestern Hotel Co. v. United States, 5 Cir., 1940, 115 F.2d 686; Main & McKinney Bldg. Co., of Houston, Tex. v. Commissioner, 5 Cir., 1940, 113 F.2d 81. Assuming an advance payment of $117,458.35, Interstate would have been entitled to a deduction of $4,698.33 each year during the term of the lease. However, petitioner argues that where a lease is canceled or terminated prior to its expiration date, the unamortized premium cost is deductible as a loss in the year of cancellation or termination. Oliver Iron Mining Co. v. Commissioner, 13 T.C. 416; Guelph Hotel Corporation v. Commissioner, 7 B.T.A. 1043; Casseatt v. Commissioner, 47 B.T.A. 400; Longview Hilton Hotel Co. v. Commissioner, 9 T.C. 180; Plaza Investment Co. v. Commissioner, 5 T.C. 1295.

Longview Hilton Hotel Co. v. Commissioner, supra, seems at first blush to be very similar to the case at hand. In that case the taxpayer obtained a loan in 1941 secured by a mortgage on its hotel property. For services in securing the loan it paid fees to brokers. Pursuant to the requirement of the revenue agent, it amortized these fees over the life of the loan and in its returns for the fiscal years 1941, 1942 and 1943, took pro rata deductions. At the close of its fiscal year 1944, petitioner was dissolved and its assets were distributed in kind to its then stockholders who assumed the liability for the unpaid portion of the original loan. The Tax Court held that the taxpayer could properly deduct the remaining unamortized portion of the brokerage fees in the year of dissolution. Judge Arundell, speaking for the court, made this important comment:

> "Here the real question is not whether the petitioner sustained a loss upon the distribution of its assets to its stockholders, because the brokerage fees did not form a part of its cost basis on any of the property distributed. S. & L. Building Corporation, supra [19 B.T.A. 788]; East Ninth Euclid Co., 26 B.T.A. 32. They were a separate and distinct item representing cost of the use of money borrowed rather than cost of property. The only significance of dissolution and liquidation is that it marked the close of the period during which the petitioner had the use of the money." 9 T.C. 183.

This case seems distinguishable from the one under consideration because in the present case the lease premium did form a part of the cost basis of the lease; the lease was specific property capable of assignment, and the cancellation of the lease by Interstate was in

---

10. Fair market value is controlling. See Volker v. U. S., D.C.Mo., 40 F.2d 697; Luttrell v. U. S., 6 Cir., 1928, 41 F.2d

517; Jankowsky v. Commissioner, 10 Cir., 1952, 56 F.2d 1006.

substance a distribution in liquidation. Cooper Foundation, the sole stockholder of Interstate, would have taken an assignment of the lease if anyone except Cooper Foundation held the fee. But since it held the fee, it could accomplish in substance a transfer of the interest covered by the lease to itself merely by having its controlled corporation cancel the lease. There was no loss by reason of any diminution in the value of the lease. And even if there were, Interstate would not be entitled to a deduction. Federal Tax Regulations 118, Sec. 39.22 (a)–20 specifically provides:

"No gain or loss is realized by a corporation from the mere distribution of its assets in kind in partial or complete liquidation, however they may have appreciated or depreciated in value since their acquisition."

The shareholder, in this case Cooper Foundation, who receives the asset distributed may have a loss. See 26 U.S. C.A. § 115(c) and Federal Tax Regulations 118, Sec. 39.115(c). But Interstate does not.

In Plaza Investment Co. v. Commissioner, 5 T.C. 1295, Judge Leech, disposes of a problem in some respects similar to the problem under consideration with this instructive comment:

"The issue involved in the year 1942 is whether the unamortized balance of a brokerage fee for securing a long term lease of certain of petitioner's real estate is deductible in that year when it dissolved and distributed all its assets to its stockholders. Petitioner contends that a renting commission is an ordinary and necessary business expenditure to be amortized over the life of the lease; that it is not an asset that can be sold, exchanged or realized upon in any manner. We think it is settled that an expenditure to acquire an asset which is expected to be income producing over a period of years is a capital expenditure and not within the term 'ordinary and necessary business expense.' (Cases cited.) Petitioner further argues that since petitioner was dissolved as of December 31, 1942, it could no longer amortize the balance of the expenditure and it should be allowed to deduct the unamortized balance either as an ordinary expense or, in the alternative, as a loss incurred in that year. Petitioner contends the situation here is similar to that existing in the case of S. & L. Building Corporation, 19 B.T.A. 788. We there held that the taxpayer was entitled to deduct the unamortized balance of an expenditure made to procure a mortgage on certain of its real estate which was sold and the mortgage assumed by the purchaser of the property. We do not think the facts are analogous to those here involved. Clearly the taxpayer in paying a fee to secure a mortgage acquired no capital asset, but an expense in connection with the creation of a liability. *The dissolution of the petitioner did not terminate the lease. The benefit from the expenditure will continue until the expiration of the term of the lease.* The liquidation of petitioner by transfer of all its assets in kind constituted a nontaxable exchange. * * * The respondent's determination upon this issue is approved." 5 T.C. 1297 (Emphasis added.)

■ The same line of reasoning applied in the foregoing cases was applied and developed more fully in Wolan v. Commissioner of Internal Revenue, 10 Cir., 1950, 184 F.2d 101. In that case the taxpayer owned an apartment in Los Angeles which it leased in October, 1936, to the Sevenorm Corporation for a term of 20 years. Sevenorm paid the taxpayer $35,000 as advance rental under the lease and taxpayer reported that amount as income in its return for 1937. Sevenorm capitalized the $35,000 rental payment and lease expenses on its books to be amortized over the lease term. At the time of the execution of the lease, the taxpayer owned no stock in Seve-

norm. In 1939, the taxpayer acquired all the capital stock of Sevenorm for $21,000. In November of that year Sevenorm was completely liquidated and all its assets were distributed to the taxpayer. At that time, the unamortized balance of the lease expenses on the books of Sevenorm was $32,727.65. The Court of Appeals refused to allow Sevenorm to deduct this amount in the year of liquidation stating:

"Under settled law the advance rentals paid and lease acquisition costs incurred by Sevenorm had the character of capital investments and were required to be capitalized by Sevenorm and amortized over the term of the lease. The acquisition by the taxpayer, on the liquidation of Sevenorm, of the lease as an asset did not change the situation with respect to the unamortized balance of the lease expenses paid by Sevenorm. Both parties concede that for the purpose of amortizing the balance of the lease expenses by the taxpayer, the continued existence of the lease for that purpose, although fictional, was properly recognized.

"However, the taxpayer contends that upon its dissolution and liquidation, such fictional existence terminated and it thereupon lost or abandoned the unamortized balance of $32,727.65 and was entitled to deduct that amount in its return for the year ending September 30, 1944.
* * *

"The government asserts that all of the assets of the taxpayer, including the right to have the existence of the Sevenorm lease continued fictionally until the end of its term, for the purpose of deducting at the rate of $1,934.52 annually the unamortized portion of the lease expenses remaining when taxpayer acquired the assets of Sevenorm, passed to the stockholders on the liquidation of taxpayer. We agree. We see no reason why such fictional existence, of the lease should not continue to be recognized after the assets passed to the stockholders of the taxpayer. That would result in permitting the stockholders to continue to deduct annually the unamortized portion of such lease expenses at the annual rate of $1,934.52." 184 F.2d 104.

The court is of the opinion that the same rule followed in the Wolan case should be followed here. Interstate is not entitled to deduct all of the unamortized balance of the lease premium in the year of its liquidation. Other cases cited by counsel for the petitioner do not dictate a contrary result.

### Tax Evasion Scheme

▆▆▆▆▆▆▆ Although what has already been said adequately disposes of this case, the court would like to mention that many of the circumstances surrounding the transactions in question indicate a sham for the purpose of evading taxes.

"'It is conceded, as it must be, that a taxpayer has the legal right to decrease the amount of what would be his taxes or avoid them by means which the law permits. * * * But a mere subterfuge, device or contrivance for the avoidance of taxes, adopted in order to disguise the true character of a transaction and to make it appear to be something that it is not, will not serve its intended purpose. Its form will be disregarded.'" Tyson v. Commissioner, 8 Cir., 1944, 146 F.2d 50, 54.

A few of the factors indicating that the lease premium payment was a sham are these: The old lease had four years to run when the new lease was executed; the premium ($117,458.35) paid for the 25-year lease was more than twice the amount the Cooper Foundation had within a few months prior paid for the entire fee ($51,026.37); the new lease was cancelled within the tax year of its execution; Mr. Cooper was the principal officer of both lessor and lessee; and the other stockholder of the lessee transferred his stock to the Cooper Foundation for a small sum ($10,000.00) plus a percentage of the profits from the theatre operations which was very similar to the

percentage of profits he received as a stockholder of Interstate.

For the reasons stated the Court has reached the conclusion that the petitioner was not entitled to the deduction claimed. Counsel for the Government shall prepare and submit for approval the appropriate judgment to be entered in accordance with this memorandum.