**ACTION DISTRIBUTING COMPANY, INC., Petitioner–Appellant,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 88–1182.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 16, 1988.

Decided June 1, 1989.

Rehearing Denied July 25, 1989.

D. Michael Kratchman argued, Edward M. Deron, Dennis F. Tomorsky, Evans &

---

Luptak, Detroit, Mich., for petitioner-appellant.

Gary R. Allen, Chief U.S. Dept. of Justice, Appellate Section Tax Div., Washington, D.C., Mary F. Clark, Robert S. Pomerance argued, for respondent-appellee.

Before MARTIN and JONES, Circuit Judges, and FEIKENS, Senior District Judge.*

PER CURIAM:

The question presented is whether Action Distributing Company, Inc. (hereinafter "Action") is entitled as United Beverage Wholesalers, Inc.'s (hereinafter "United") transferee to a deduction for leasehold improvement expenditures which remained unamortized when the United/Byrne leases were terminated. The Tax Court held that Action was not entitled to a deduction because the terminations of the leases effected a liquidating distribution to Byrne.

This case arises from Robert Byrne's decision to leave the wholesale beer distribution business. As of July 19, 1976, Byrne owned one hundred percent of the outstanding stock of United Beverage Wholesalers, Inc., a Michigan corporation. United operated four beer distributorships in Michigan: two were located in Detroit, a third in Hillsdale, and the fourth in Kalamazoo. Budweiser beer was marketed by one of the Detroit distributorships. Altes/Colt 45 beer was marketed by the second.

Byrne was also the "100% owner" of six out of the seven buildings used by United to operate its Detroit distributorships (hereinafter "buildings one through six"). Byrne had a fifty percent interest in the seventh building. One quarter of the remaining interest in the seventh building was held by Byrne in trust for the benefit of his daughter, Kathleen M. Byrne. The final quarter was held by Byrne's former wife, Margaret O. Byrne.

The seven buildings were leased to United under four separate leases. While United was Byrne's tenant, it expended $487,909 for leasehold improvements. United claimed depreciation allowances for these expenditures using the straight-line method over the useful lives of the various improvements.

On July 19, 1976, United adopted a plan of liquidation under § 337 of the Internal Revenue Code of 1954.[1] On July 21, 1976, United sold its Budweiser distributorship to the Wolpin Company (hereinafter "Wolpin"). The sale was conditioned upon Wolpin's obtaining a lease for buildings five through seven. On October 15, 1976, the United/Byrne leases pertaining to these three buildings were terminated by "mutual agreement." On the same day, Byrne and Wolpin entered into a new lease for three buildings.

On December 13, 1976, United agreed to sell its Altes/Colt 45 distributorship to Demas Distributors, Inc. (hereinafter "Demas"). The Demas sale was conditioned on the availability of a lease for buildings one through three. On April 1, 1977, Demas and United executed a purchase agreement for the Altes/Colt 45 distributorship. On the same day, Demas entered into a lease for buildings one through three. On July 15, 1977, the taxpayer, Action Distributing Company, purchased from Byrne all outstanding and issued stock of United. On July 15, 1977, United was completely liquidated; its remaining assets were distributed to Action.

United, through its transferee Action, claimed deductions for leasehold expenditures which were unamortized at the time the United/Byrne leases terminated. By notice of liability dated November 12, 1981, the Commissioner disallowed the deductions.

The question presented is whether Action is entitled, as United's transferee, to a deduction for leasehold improvement expenditures which remained unamortized when

* Honorable John Feikens, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. Unless otherwise indicated, all Section references are to Internal Revenue Code of 1954, as amended and in effect during the taxable years in question.

the United/Byrne leases terminated. Relying on four prior decisions of the United States Courts of Appeals and of the Tax Court, the Tax Court held that no deduction was available for leasehold expenses incurred with respect to buildings one, two, three, five or for one-half of the expenditures made with respect to building seven because the "net effect" of the lease cancellations was a distribution in liquidation. The Tax Court, however, allowed United a deduction for one-half of the expenditures made with respect to building seven because it found that one-half of the improvements reverted to lessors unrelated to United—Margaret O. Byrne, and Byrne as trustee for the Kathleen Byrne Trust. *Action Distributing Company v. C.I.R.*, 53 T.C.M. (CCH) 1491, 1500 (1987). We conclude that the United/Byrne lease terminations did not effect a liquidating distribution within the meaning of §§ 336 or 337. 26 U.S.C.A. §§ 336, 337 (West 1978). However, we affirm the Tax Court on the grounds that a lessee may not accelerate amortization or depreciation of capital expenses incurred with respect to its lease when it assigns its leasehold interest to a related lessor.

### I.

■ When a lessor and lessee are related, capital expenditures must be amortized or depreciated over the useful life of the asset rather than over the lease term. I.R.C. § 178(b) (West 1978) (amended 1984, 1986); Treas.Reg. 1.178–1(d); Treas.Reg. 1.178–2 (1960).[2] Amortization over the life of the asset is required because when a related lessee and lessor terminate a lease, the use or benefit of the investment is not lost. Use or benefit may continue as lessor rather than lessee. Requiring amortization over the life of the asset is more likely to correspond to the actual use or benefit the lessee will make of the asset. H.R. Rep. 775, 85th Cong. 1st Sess., 1958–3 Cum.Bull. 811, 822–23; *see also Hudlo v. C.I.R.*, 30 T.C.M. 894, 929 (1971).[3]

When the lessor and lessee are related, the market cannot be relied upon to assure the integrity of the lease term. If related parties could amortize or depreciate capital expenditures according to the lease term, they might choose to enter into a series of short-term leases, or terminate a lease early, in order to accelerate amortization or depreciation. Because Byrne owned all of United's stock, cancellation of the United/Byrne leases did not result in a change in effective control over the property. Both before and after the cancellation, Byrne had the power to arrange the use of the leased premises.[4] Permitting Action the claimed deduction would have the ef-

2. During the taxable years in question, Section 178(b) read as follows:

(b) Related Lessee and Lessor

(1) General Rule. If a lessee and lessor are related persons (as determined under paragraph (2)) at any time during the taxable year then, in determining the amount allowable to the lessee as a deduction for such taxable year for exhaustion, wear and tear, obsolescence, or amortization in respect of any building erected (or other improvement made) on the leased property, the lease shall be treated as including a period of not less duration than the remaining useful life of such improvement.

(2) Related persons defined. For purposes of paragraph (1), a lessor and lessee shall be considered related persons if

. . . . .

(B) the relationship between the lessor and lessee is one described in subsection (b) of section 267, except that, for purposes of this subparagraph, the phrase "80 per cent or more" shall be substituted for the phrase "50

percent or more" each place it appears in such subsection.

For purposes of determining the ownership of stock in applying subparagraph (B), the rules of subsection (C) of section 267 shall apply, except that the family of an individual shall include only his spouse, ancestors, and lineal descendants.

3. Amortization over the useful life of an asset is the general rule; amortization over a shorter period is an exception to the general rule. *See* Treas.Reg. 1.167(a)–1(a); Treas.Reg. 1.162–11(b) *cf.* Treas.Reg. 1.167(a)–4.

4. This is in no way intended to suggest that the cancellations were a sham or step transaction. *See Action Distributing Co.*, 53 T.C.M. at 1497. The United liquidation may well have been structured exactly the same way, even if United had been an unrelated party. Nonetheless, the absence of the check provided by traditional market forces tends to change the economic incentives for structuring a transaction one way or another.

fect of allowing amortization to be completed before the useful life of the leasehold improvements had ended.

## II.

■ The Tax Court's analysis is based upon a line of four cases: *Wolan v. Commissioner,* 184 F.2d 101 (10th Cir.1950); *Cooper Foundation v. O'Malley,* 121 F.Supp. 438, *aff'd* 221 F.2d 279 (8th Cir. 1955); *Tom L. Burnett Cattle Company v. Commissioner,* 19 T.C.M. 94 (1960); and *Plaza Investment Company v. Commissioner,* 5 T.C. 1295 (1945). The proper characterization of the tax consequences of the United/Byrne lease cancellations does not turn upon a finding that the cancellations effected a liquidating distribution.

*General Utilities Co. v. Helvering,* 296 U.S. 200, 56 S.Ct. 185, 80 L.Ed. 154 (1935), held that a corporation does not recognize gain on the distribution of appreciated property to its shareholders. The *General Utilities* doctrine was subsequently embodied in Treasury Regulations, ultimately becoming § 336 of the 1954 Code. Both the regulations and § 336 provide for non-recognition of gain or loss by the corporation upon a distribution to its shareholders of property.

The concern of the *General Utilities* doctrine, and its statutory successors, is the treatment of gain or loss resulting from market appreciation or depreciation. The Treasury Regulation in effect prior to enactment of § 336 says just that. It provides that a corporation will not recognize gain or loss "however [the assets] may have appreciated or depreciated in value since their acquisition." Treas.Reg. 118, § 39.22(a)–20 (1953); *see* also *Hillsboro Nat. Bank v. C.I.R.,* 460 U.S. 370, 398, 103 S.Ct. 1134, 1150, 75 L.Ed.2d 130. As noted in *Hillsboro:*

> This background [of § 336] indicates that the real concern of the provision is to prevent recognition of market appreciation that has not been realized by an arm's-length transfer....

*Hillsboro,* 460 U.S. at 398, 103 S.Ct. at 1151.

Thus, the *General Utilities* doctrine is only implicated here if the claimed deduction is based upon depreciation in the market value of the leasehold improvements.

The claimed deduction, however, is not based upon diminution of the market value of the lease improvements or of the leasehold itself. Therefore, to allow, or disallow, the deductions because the lease cancellations effected a liquidating distribution would not be correct. The four cases cited by the Tax Court are consistent with such a holding.

■ In *Wolan,* Seven Fifteen South Normandie, Inc. (hereinafter "Seven Fifteen") owned an apartment complex. On October 30, 1936, Seven Fifteen leased the complex to Sevenorm Corporation. Sevenorm paid Seven Fifteen $35,000 as advance rent. Sevenorm capitalized the advance rental payment along with other lease expenses and began amortization over the twenty-year lease term.

In 1939, Seven Fifteen acquired all the capital stock of Sevenorm. In November of 1939, Sevenorm was completely liquidated pursuant to § 112(b)(6) of the Internal Revenue Code of 1939 which provides for non-recognition of gain or loss upon the liquidation of one corporation by another; the parent steps into the shoes of the liquidated corporation.

In 1941, Seven Fifteen leased the complex to a third party. The new lease is known as the Wallach lease. Seven Fifteen capitalized the expenses incurred in making the Wallach lease and began amortizing these expenses over the fifteen-year lease term.

In 1944, Seven Fifteen was completely liquidated and all of its assets were distributed to its stockholders. Seven Fifteen claimed deductions for unamortized lease expenses outstanding on both the Sevenorm and Wallach leases. The Tax Court sustained the Commissioner's disallowance of the claimed deductions. On appeal, the United States Court of Appeals for the Tenth Circuit affirmed.

The question resolved with respect to the Sevenorm lease was whether the fictional

existence of the Sevenorm lease, required by the tax-free dissolution of Sevenorm, would continue to be recognized upon the dissolution of Seven Fifteen. *Wolan,* 184 F.2d at 104. The court in *Wolan* held that the fiction should continue to be recognized with the result that Seven Fifteen's shareholders could continue to deduct annually an aliquot portion of the unamortized expenses. The same result was obtained with respect to the Wallach lease.

The principal concern of the court in *Wolan* was that the liquidation of Seven Fifteen not permit complete amortization of the leasehold expenses ahead of the usual schedule. It applied the fiction because it recognized that the shareholders would continue to benefit from the leasehold even though it had legally come to an end.

Although the court's opinion does not expressly indicate that the relationship between the lessee and lessor influenced its decision, it is clear that the court was aware of the unity of economic interests between the lessees and lessors of the Sevenorm lease. The fiction which the court relied upon had its origin in the parent/subsidiary relationship between Sevenorm and Seven Fifteen. The acquisition of the Sevenorm lease "did not change the situation with respect to the unamortized balance of leasehold expenses" because Seven Fifteen stepped directly into Sevenorm's shoes under § 112(b)(6). Similarly, the court in *Wolan* saw no reason why the fiction should not be extended to the Seven Fifteen shareholders because they were the "successor[s] in interest" of the lessor. The court applied a similar analysis in its treatment of the Wallach lease. It noted that the "economic interest" in the Wallach lease had passed to the shareholders. No deduction was allowable in respect to either the Sevenorm or Wallach leases because of the unity of economic interest between Seven Fifteen and its shareholders.

The decision in *Wolan* was not based upon a finding that a liquidating distribution occurred. The *General Utilities* doctrine was inapplicable because Seven Fifteen did not claim a deduction for diminution of the market value of the leasehold. Moreover, the court in *Wolan* found that the shareholders could continue amortizing the advance rental payment as had Seven Fifteen. When non-recognition is required with respect to a distribution at the corporate level, recognition is required at the shareholder level with respect to the distribution. It would be inconsistent to allow shareholders to take the disallowed deduction if the asset to be amortized was received in a distribution subject to non-recognition at the corporate level.

The question raised in *Plaza Investment* was whether the taxpayer/lessor could deduct the unamortized balance of a brokerage fee for securing a long-term lease in the year the lessor corporation liquidated and distributed its assets to its shareholders. The Tax Court held that it could not. In so holding, the Tax Court noted that "[t]he dissolution of petitioner did not terminate the lease. The benefit of the expenditure will continue until the expiration of the term of the lease." [5] *Plaza Investment* 5 T.C. at 1296. In both *Wolan* and *Plaza Investment,* accelerated amortization was denied because the lessee's use or benefit from the lease was not lost, but merely passed to the shareholders who could continue to use the premises.

In *Cooper Foundation v. O'Malley,* the district court denied a deduction for the unamortized portion of a lease premium because the lease termination was in substance a liquidating distribution by the corporation to its sole shareholder. *Cooper Foundation,* 121 F.Supp. at 446. The United States Court of Appeals for the Eighth Circuit affirmed because the district court's factual determination was "permissible." *Cooper Foundation,* 221 F.2d at

---

5. In the sentence which follows immediately after the above quoted sentence, the court in *Plaza Investment* does note that the distribution of the corporate assets to the shareholders was subject to nonrecognition pursuant to Treas. Reg. 111 § 29.22(a)–20. Yet, the deduction was not disallowed because of the fact that a liquidating distribution occurred but because the transaction was tax free at the corporate level. *See Post v. Commissioner,* 109 F.2d 135 (2nd Cir.1940).

281. The district court opinion, however, reveals that its decision had little to do with finding that the lease cancellation effected a liquidating distribution.

Prior to July 6, 1943, the Ute Theatre was owned by the Rialto Corporation and was under lease to Interstate Corporation. Fifty percent of the Interstate stock was owned by J.H. Cooper. The remaining fifty percent was owned by J.E. Tompkins. On July 6, 1943, the Rialto Corporation sold the Ute Theatre to the Cooper Foundation (hereinafter "Foundation"). Mr. Cooper had established the Foundation and was active in its management. The Rialto/Interstate lease was canceled and the Foundation and Interstate entered into a new twenty-five year lease. In consideration of the execution of the new long-term lease, Interstate paid the Foundation a substantial premium. In December 1943, both Cooper and Tompkins transferred their Interstate stock to the Foundation. Thus, the Foundation became the fee simple owner of the Ute Theatre. Thereafter, the twenty-five year Foundation/Interstate lease was canceled and Interstate was dissolved and liquidated. Interstate charged off the lease premium as a loss on its 1943 income tax return.

The district court took note of two important facts: (1) that Interstate suffered no loss by reason of market depreciation of the lease, and (2) that the Foundation would have taken an assignment of the Foundation/Interstate lease if it had been an unrelated party. *Cooper Foundation,* 121 F.Supp. at 445–446. Whether or not there was distribution in liquidation was beside the point because the deduction was not based upon diminution in the value of the leasehold. *Id.* at 446. More important, if the sole stockholder of Interstate had been unrelated to the Foundation, then that shareholder would have taken an assignment of the lease rather than canceling it. By canceling the Foundation/Interstate lease, the Foundation attempted to use its relationship with Interstate to accelerate amortization despite the fact that real economic control over the leased premises was not changed by the cancellation.

In *Tom L. Burnett Cattle Co.,* Anne Burnett (hereinafter "Burnett") was the sole stockholder of the Tom L. Burnett Cattle Company (hereinafter "cattle company"). Burnett owned all of the grazing land utilized by the cattle company except for a small portion which was owned by the estate of Burnett's father. Burnett served as executrix of the estate. Burnett and the estate leased the grazing lands to the cattle company. The cattle company made improvements to the leaseholds. Some of the improvement expenses remained unamortized when the cattle company was liquidated and its assets distributed to Burnett. The cattle company claimed a deduction for the unamortized portion of the improvement expenses; the Commissioner disallowed the deduction. In the Tax Court, the Commissioner conceded that Burnett could continue annual amortization of the leasehold expenses as if the lease had continued, but argued that the cattle company was not entitled to an immediate deduction. *Burnett,* 19 T.C.M. at 96. The Tax Court found that the cattle company had made a liquidating distribution to Burnett of the leasehold and the improvements thereon.

*Burnett* is no different than *Wolan* and *Plaza Investment.* Like *Wolan,* the principles of the *General Utilities* doctrine are inapplicable because the loss claimed is unrelated to diminished market value. Similarly, the Commissioner's concession that Burnett could continue amortization over the life of the lease may be inconsistent with a finding that a liquidating distribution occurred. The controlling fact in *Burnett* was that the lessee did not lose the benefit of its investment upon liquidation because the lessee and the lessor were related.

*Strauss v. United States,* 199 F.Supp. 845 (W.D.La.1961), is the case cited by Action. *Strauss* and the case before this court are virtually identical. Discussing the *Wolan* line of cases, the court in *Strauss* noted:

> The inquiry is whether, due to the relationship between the lessors and the other corporate stockholders, the net effect of the transaction is to distribute corpo-

rate assets to stockholders or to effect a *bona fide* cancellation of the lease whereunder the improvements become the property of the lessors.

*Strauss,* 199 F.Supp. at 852.

Because the court in *Strauss* found no evidence casting doubt on the lease cancellation, it found that the transaction was "not objectionable *for tax purposes." Id.* at 855 (emphasis in original). The court recognized that the focus of inquiry was the relationship between the lessor and the lessee, and not whether there was a liquidating distribution. What the court did not take into account was the policy that amortization of leasehold improvements should occur according to the use or benefit that the lessee is actually likely to derive from the investment.

Accordingly, the decision of the Tax Court is affirmed.